**UNITED STATES v. BORDEN CO. et al.**
No. 31197.

District Court, N. D. Illinois, E. D.
July 13, 1939.

178

William J. Campbell, U. S. Dist. Atty., of Chicago, Ill., Thurman Arnold, Asst. Atty. Gen., and Leo F. Tierney, Maurice L. A. Gellis, Christopher Del Sesto, Daniel B. Britt, H. Douglas Weaver, Thomas H. Daly, Geo. P. Alt, and Sheridan Morgan, Sp. Assts. to Atty. Gen., for plaintiff.

Fréderic Burnham, Donald F. McPherson, Cecil I. Crouse, Howard Neitzert, and Miles G. Seeley, all of Chicago, Ill., for defendants Borden Co. and others.

Louis E. Hart, Irving Herriott, and L. Edward Hart, Jr., all of Chicago, Ill:, for defendants Bowman Dairy Co. and others.

Gann, Secord, Stead & McIntosh, Loy N. McIntosh, and Bernhardt Frank, all of Chicago, Ill., for defendants Sidney Wanzer & Sons, Inc. and others.

Charles S. Deneen, Roy Massena, and Donald N. Schaffer, all of Chicago, Ill., for defendants Hunding Dairy Co. and others.

Isidore Fried, Herbert B. Fried, and Bernard A. Stol, all of Chicago, Ill., for defendants Capitol Dairy Co. and others.

Edward H. Murnane and James A. Harrington, both of Chicago, Ill., for defendants Western United Dairy Co., Inc., United Dairy Co., Western Dairy Co., and others.

Russell J. McCaughey, Fred C. Nonnamaker, Jr., and Packard, Barnes, McCaughey & Schumacher, all of Chicago, Ill., for defendants Associated Milk Dealers, Inc., and others.

George W. Lennon, W. C. Graves, Martin Burns, Schuyler & Hennessy, and Henry E. Jacobs, all of Chicago, Ill., for defendants Pure Milk Ass'n and others.

Joseph A. Padway, of Milwaukee, Wis., and David A. Riskind, of Chicago, Ill., for defendants Milk Wagon Drivers Union, Local 753, and others.

Kirkland, Fleming, Green, Martin & Ellis, of Chicago, Ill., for Leslie G. Goudie.

Isham, Lincoln & Beale, Ben H. Matthews, and James P. Dillie, all of Chicago, Ill., for Arbitration group—Leland Spencer and W. A. Wentworth.

Thomas Dodd Healy, of Chicago, Ill., for Daniel A. Gilbert.

Charles F. Rathbun, of Chicago, Ill., for Herman N. Bundeson, Paul Krueger and William J. Guerin, of Board of Health.

WOODWARD, District Judge.

This matter comes up on the several demurrers and motions to quash an indictment in four counts, charging fourteen corporations and associations and forty-three individuals with engaging in an unlawful combination and conspiracy in restraint of interstate commerce in fluid milk in violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1.

The averments of the indictment may be condensed and summarized as follows:

The city of Chicago, Illinois, has a population in excess of three and one-half million people. In excess of a million quarts of fluid milk are distributed and sold each day in the city of Chicago. The production of milk destined for ultimate distribution and sale as fluid milk in the city of Chicago, its transportation to the city, its preparation for distribution and sale within the city, and its distribution and sale within the city are regulated by an ordinance of the city of Chicago and by rules and regulations promulgated by the Board of Health. Under the ordinance and under the regulations of the Board of Health, fluid milk distributed and sold in the city of Chicago must be produced on a dairy farm approved by the Board of Health. Such dairy farm is known as an approved dairy farm.

In the states of Illinois, Indiana, Michigan and Wisconsin there are more than fifteen thousand approved dairy farms. More than fifty per cent of the approved dairy farms are located in states other than Illinois. Of the fluid milk produced on approved dairy farms, approximately forty per cent is produced on approved dairy farms in Indiana, Michigan and Wisconsin.

Fluid milk produced on approved dairy farms is transported to Chicago in two ways: (a) From approved dairy farms to country stations where it is commingled and combined with fluid milk from other approved dairy farms and thereafter transported from the country stations to Chicago by motor vehicle or by railroad; and (b) directly from approved farms by motor vehicle.

Fluid milk by its nature is perishable. It cannot be stored and it must reach the consumer within a short time after its production. Pursuant to the ordinance of the city of Chicago and to the rules and regulations of the Board of Health, all fluid milk transported to Chicago for sale and distribution therein must be delivered daily to a place, premise or establishment where milk is collected preparatory to pasteurization elsewhere, or to a pasteurization plant where milk is handled or otherwise prepared for distribution and sale as fluid milk.

More than one hundred twenty-five distributors, some of whom are made defendants under the designation "major distributors", purchase fluid milk from producers for distribution and sale in the city of Chicago. The major distributors commingle the fluid milk from Indiana, Michigan and Wisconsin with milk produced in Illinois and then sell the commingled milk in Chicago as one product.

The individual defendants, except a police officer of the city of Chicago, the officers of the Chicago Board of Health, and two arbitrators, are associated with or employed by the corporation and association defendants.

Each of the major distributors is an Illinois corporation engaged in the sale

and distribution of fluid milk in the city of Chicago. .Approximately sixty-five per cent of the fluid milk sold in the city of Chicago is sold by the major distributors. All major distributors maintain country stations in states outside of Illinois, receive fluid milk at such country stations and transport it to Chicago.

The Associated Milk Dealers, Inc., is an Illinois corporation. Substantially all the members of the Associated Milk Dealers, Inc., are distributors doing business in the city of Chicago. The major distributors dominate and control its activities.

The Pure Milk Association is a corporation organized under "The Cooperative Marketing Act" of Illinois, Ill.Rev. Stat.1937, c. 32, § 440 et seq. It has a membership in excess of twelve thousand producers, approximately fifty per cent of whom are located outside of Illinois.

It is constituted the sole and exclusive agent for marketing the milk of its members. In excess of eighty per cent of the milk produced by its members is produced on approved dairy farms, seventy-five per cent of which is purchased by the major distributors.

The Milk Dealers Bottle Exchange is an Illinois Corporation. The major distributors own in excess of eighty per cent of its outstanding capital stock and dominate and control its activities and business. It is engaged in collecting, exchanging and distributing milk bottles, cans and other containers used by distributors. Special discounts are allowed to stockholders which are not allowed to non-stockholders on charges for services rendered.

The Milk Wagon Drivers Union, Local 753, International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America is a voluntary unincorporated association and is affiliated with the American Federation of Labor. Its members are employed by distributors in connection with the distribution and sale of fluid milk in the city of Chicago. Approximately seventy-five per cent of all its employed members are employed by the major distributors.

Daniel A. Gilbert is a public officer of the city of Chicago.

The officers of the Board of Health are charged with the administration of the milk ordinance of the city of Chicago and the rules and regulations promulgated thereunder.

The two arbitrators were members of an arbitration board which arbitrated a dispute between the major distributors and the Pure Milk Association.

The indictment charges that commencing in the month of January, 1935, and continuously thereafter until the presentation of the indictment, the defendants engaged in an unlawful conspiracy in restraint of trade and commerce in fluid milk among the several states.

*Count 1:*

Count 1 charges a conspiracy "to arbitrarily fix, maintain and control artificial and non-competitive prices to be paid to all producers by all distributors for all fluid milk produced on approved dairy farms located in the states of Illinois, Indiana, Michigan and Wisconsin", and shipped to Chicago.

The means and methods whereby the conspiracy was intended to be effected are set forth at length. It is necessary to state only the general scheme. The major distributors, the Pure Milk Association and the Associated Milk Dealers, fixed and agreed upon uniform terms and conditions for the purchase of fluid milk from the Pure Milk Association, including price provisions. Through price letters and a monthly periodical, the Pure Milk Association fixed the prices to be paid for fluid milk by all independent distributors to independent producers. The arbitrator defendants sat on a board of arbitration which arbitrated a dispute between the Pure Milk Association and the major distributors. The Bottle Exchange discriminated against distributors who refused to purchase fluid milk at the prices thus fixed. Local 753, its adviser and the police officer, by threats, intimidation and acts of violence interfered with the business of independent distributors. The Board of Health defendants gave preferential treatment to member-producers and discriminated against independent producers.

The gravamen of the offense charged in this count is the fixing, maintaining and controlling of prices to be paid fluid milk producers.

*Count 2:*

Count 2 charges a conspiracy "to fix and maintain by common and concerted action, uniform, arbitrary and non-competitive prices for the sale by the distributors in the city of Chicago of fluid milk shipped into the said city from the states of Illinois, Indiana, Michigan and Wisconsin."

Again the means and methods are set forth at length. The major distributors,

the Pure Milk Association and the Associated Milk Dealers, agreed and fixed upon uniform, arbitrary and non-competitive prices to be exacted from and paid by the purchasers of fluid milk. This agreement was executed by the major distributors. Its effect was to compel independent distributors to exact a like price from their customers. The Pure Milk Association refused to sell fluid milk to distributors who would not maintain the fixed price. Substantially the same allegation is made as to the arbitrator defendants as is made in Count 1. The Bottle Exchange discriminated against distributors who refused to maintain the fixed prices. Local 753, its adviser and the police officer, interfered by threats, intimidation and violence, with independent distributors not conforming to the fixed price standard. The Board of Health defendants gave preferential treatment to producers who sold to distributors maintaining the fixed prices and imposed unreasonable burdens on distributors who refused conformity.

The gravamen of the offense charged in this count is the fixing and maintaining of prices at which fluid milk is sold in Chicago.

*Count 3:*

Count 3 charges a conspiracy

"(a) to hinder and to prevent prospective and independent distributors from engaging in the business of distributing fluid milk in the city of Chicago;

"(b) to hinder and to prevent existing independent distributors from distributing fluid milk in the city of Chicago in competition with the major distributors;

"(c) to hinder and to prevent the distribution of fluid milk to stores and by stores in the city of Chicago; and

"(d) to hinder and to prevent any distribution of fluid milk in the city of Chicago, except by the method and in the manner determined by said defendants."

Likewise the means and methods are set forth somewhat at length. The major distributors refrained from competing with each other for customer accounts; refused a stop served by any other distributor unless allowed to serve such stop exclusively; and by means of cash payments, loans, gifts, special discounts and other securities obtained the privilege of serving stops exclusively. The Associated Milk Dealers adopted and enforced a rule requiring independent distributors to refrain from taking stops of major distributors. The Pure Milk Association refused to sell fluid milk to independent distributors who attempted to take the stops of major distributors and did other things to hinder the business of independent distributors. The arbitrator defendants rendered the arbitration award hereinbefore referred to. The Milk Dealers Bottle Exchange delayed the return of bottles of independent distributors and refused to sell independent distributors corporate stock. Local 753, its adviser and the police officer, by a series of threats, coercion and violence hindered and delayed independent distributors in their business of distributing fluid milk in the city of Chicago. The Board of Health defendants, acting arbitrarily, imposed onerous burdens on the distribution of fluid milk in the city of Chicago by independent distributors.

The gravamen of the offense charged in this count is the determination and control of the distribution of fluid milk in Chicago.

*Count 4:*

Count 4 charges a conspiracy "to restrict, limit and control and to restrain and obstruct the supply of fluid milk moving in the channels of interstate commerce into the city of Chicago from the states of Illinois, Indiana, Michigan and Wisconsin."

As in the other counts means and methods whereby the conspiracy charged was to be effected are set forth. The Pure Milk Association enforced a base surplus plan of production by which it limited the total production of fluid milk by member producers and did other incidental acts to enforce the base surplus plan. The major distributors entered into agreements with the Pure Milk Association whereby the base surplus plan might be effected. The arbitrator defendants did the acts hereinbefore referred to. The Associated Milk Dealers acted in concert with the Pure Milk Association to enforce the base surplus plan. The Bottle Exchange delayed and refused to return milk bottles and containers to independent distributors who refused to sell their milk through the Pure Milk Association. Local 753, their adviser and the police officer, by threats, intimidation and coercive measures, exerted their influence against independent distributors to carry out the base surplus plan. The Board of Health defendants gave preferential treatment and imposed arbitrary burdens upon independent producers. The

count further states that "the said base-surplus plan of payment was intended to and does restrict, limit, and control, restrain and obstruct the supply of fluid milk entering the city of Chicago, by arbitrarily limiting the quantity of fluid milk for which a member-producer may be paid at base price."

The gravamen of the offense charged in this count is the control of the supply of fluid milk permitted to be brought to Chicago.

■ As ground for motion to quash the indictment, most of the defendants contend that the indictment having been returned at the October, 1938, term of court was returned by an illegal and invalid grand jury.

The facts upon which this contention is made are as follows:

The terms for the District Court of this Division are fixed by statute to be held on the first Mondays in February, March, April, May, June, July, September, October and November and the third Monday in December. 28 U.S.C.A. § 152.

The grand jury that returned the indictment was impaneled and sworn at the July, 1938, term of this court. On August 31, 1938 the grand jury appeared as a body in open court before Judge Woodward and presented a petition praying for an order authorizing the grand jury to sit during the September Term "to finish investigations begun but not finished by the said July, 1938, grand jury, and which said investigation cannot be finished during the said July, 1938, grand jury term of court." On the same day Judge Woodward entered an order, based upon such petition, authorizing the July, 1938, grand jury "to sit during the September Term for the purpose of finishing said investigations." Near the close of the September, 1938, term it became apparent to the grand jury that they could not complete their labors during that term, the grand jury appeared as a body in open court before Judge Wilkerson praying for an order authorizing them to sit during the October, 1938, term. Acting on that petition Judge Wilkerson, during the September Term, entered an order authorizing the grand jury "to continue to sit during the October, 1938, term of court for the purpose of finishing said investigations."

The applicable statute reads as follows: "A district judge may, upon request of the district attorney or of the grand jury or on his own motion, by order authorize any grand jury to continue to sit during the term succeeding the term at which such request is made, solely to finish investigations begun but not finished by such grand jury, but no grand jury shall be permitted to sit in all during more than three terms." 28 U.S.C.A. § 421.

Under the authority of this statute the grand jury can sit for a total of three terms of court. The limitations upon this right are that (a) a grand jury can be continued beyond its original term solely to finish investigations begun but not finished during the term for which it was authorized to sit, and (b) the continuance granted by the court can be only for one term at a time. The petitions and orders are clearly within the statute. The grand jury was a lawful grand jury and had full authority to return the indictment in this case.

Some hyper-critical objections are made as to the form of the order, but these objections are without merit.

The motion to quash the purported service of process upon Borden-Wieland, Inc., must be allowed. It appears that a corporation known as Borden-Wieland, Inc., was organized under the laws of Delaware. On January 4, 1936, Borden-Wieland, Inc., together with other corporations, was merged into a corporation known as Borden's Dairy Products Company, Inc. Thereafter all of the assets of Borden's Dairy Products Company, Inc., were transferred to the Borden Company, a New Jersey corporation. On February 11, 1936, Borden's Dairy Products Company, Inc., was dissolved. Borden's Dairy Products Company, Inc., is not a defendant. The merger was effected under the corporation law of Delaware which, by Section 60, Code Del.1935, § 2092, provides in part, "When an agreement shall have been signed, acknowledged, filed and recorded * * * for all purposes of the laws of this State, the separate existence of all the constituent corporations, parties to said agreement, or all of such constituent corporations except the one into which the other or others of such constituent corporations have been merged, as the case may be, shall cease * * *."

■ The effect of this section of the act is to terminate the separate existence of all the constituent merging corporations, except the one into which they have been merged. Title Guaranty Loan & Trust Co. v. Alabama By-Products Corp., 214 Ala. 486, 108 So. 353; Graeser v. Phoenix Finance Co., 218 Iowa 1112, 254 N.W. 859.

Under this statute the existence of Borden-Wieland, Inc., was terminated on the date of the merger, namely, January 4, 1936. The corporate existence of Borden-Wieland, Inc., having ceased on January 4, 1936, this court cannot obtain jurisdiction over it by service of process on its purported assistant secretary.

Counts I, II, and IV may be considered together. These counts deal with the relationship between the producer and distributor of fluid milk. That relationship is the only basis upon which the government predicates the theory that interstate commerce in fluid milk exists whereby a conspiracy under the Sherman Act may be charged. In substance, these counts charge that the defendants engaged in a combination and conspiracy to restrain trade and commerce in fluid milk among the several states (1) by fixing and maintaining prices to be paid to producers; (2) by fixing and maintaining prices to be charged by distributors to consumers; and (3) by restraining, limiting and controlling the supply of fluid milk moving in interstate commerce by means of what is known as the base surplus plan. Price fixing is the essence of these counts.

The basic act is the Sherman Act, 15 U.S.C.A. § 1-7, 15 note, under which this prosecution is sought to be maintained. The Sherman Act forbids noncompetitive control of prices in interstate commerce, without regard to the desirability of price stability, or the intent of the parties, or the benefit to the public, or the reasonableness of the price fixed.

The Sherman Act has been in force nearly fifty years. During that time sweeping changes in the nation's social and economic problems have been wrought. These changing social and economic problems are reflected in the statute law, both national and state. The Sherman Act embodies the philosophy of individualism and unrestrained competition. Statutory law, since the enactment of the Sherman Act, reflects a change in the fundamental concept on which the Sherman law is based. The tendency of later legislation has embodied the philosophy of collectivism and control of harmful competition. With the relative wisdom of these essentially incompatible philosophies, the courts have no concern. It is the duty and concern of the courts to construe and apply the applicable constitutional enactments of the political branch of the government.

The first act which makes a departure from, or an exception to, the Sherman Act was the Clayton Act of October 15, 1914, 15 U.S.C.A. § 17. By that act labor, agricultural or horticultural cooperative organizations were excepted from the broad and sweeping terms of the Sherman Act. Such cooperative organizations, in and of themselves, were not to be construed as illegal combinations or conspiracies in restraint of trade under the anti-trust laws.

The next radical departure from the theory of the Sherman Act was the Capper-Volstead Act of February 18, 1922, 7 U.S.C.A. §§ 291, 292. This act legalizes price fixing for those within its purview. To that extent it modifies the Sherman Act. It removes from the Sherman Act those organizations, cooperative in their nature, which come within the purview of the Capper-Volstead Act. Prior to the Capper-Volstead Act farmers were treated no differently than others under the anti-trust laws, so far as price fixing was concerned.

This act goes much further than section 6 of the Clayton Act. It is much broader in scope. The Capper-Volstead Act legitimatizes, for agricultural cooperative associations, specified powers and purposes. It provides that associations, qualified under its terms, may process, prepare for market, handle and market in interstate and foreign commerce the products of their members; that they may have marketing agencies in common and that they may make the necessary contracts and agreements to carry out such purposes.

Section 2, 7 U.S.C.A. § 292, recognizes that cooperative associations, in the exercise of the powers conferred upon them by section 1, may monopolize or restrain interstate trade. It confers upon the Secretary of Agriculture the power, after complaint, notice and hearing, to issue a "cease and desist" order when he finds that "the price of any agricultural product is unduly enhanced by reason" of such association monopolizing or restraining trade in interstate or foreign commerce.

The Capper-Volstead Act does not condemn any kind of monopoly or restraint of trade, or any price fixing, unless such monopoly or price fixing unduly enhances the price of an agricultural product. The Act then, by section 2 thereof, commits to an officer of the executive department, the Secretary of Agriculture, the power of regulation and visitation.

Under this act farmers are favored under the anti-trust laws in that they are given a qualified right, free from any criminal liability, to combine among themselves to monopolize and restrain interstate trade and commerce in farm products and to fix and enhance the price thereof.

This is the first statute, to which the attention of the court has been called which, with reference to farmer's cooperatives, embodies the theory of executive regulation and control of price or profit. The theory and philosophy of unrestrained competition is departed from and in its stead is substituted the theory of governmental regulation of combinations and prices. That control is vested in the Secretary of Agriculture, subject, however, under Section 2, to review by the courts. The court deduces from the Capper-Volstead Act that the Secretary of Agriculture has exclusive jurisdiction to determine and order, in the first instance, whether or not farmer cooperatives, in their operation, monopolize and restrain interstate trade and commerce "to such an extent that the price of any agricultural product is unduly enhanced." Until the Secretary of Agriculture acts, the judicial power cannot be invoked.

The Cooperative Marketing Act of July 2, 1926, 7 U.S.C.A. § 455, in this connection is not of particular significance. It was probably declaratory of the law as it existed in that cooperative organizations were authorized to control and disseminate crop, marketing, statistical and economic information. However, it does show a closer and more intimate contact with the government in that the government through the Farm Credit Administration in the Department of Agriculture was created for the purpose of acting as a clearing house for cooperatives.

The Agricultural Adjustment Act of May 12, 1933, known as AAA, 48 Stat. 31, 7 U.S.C.A. § 601 et seq., together with its amendment of August 24, 1935, c. 641, 49 Stat. 750, and the Agricultural Marketing Agreement Act of June 3, 1937, Ch. 296, 50 Stat. 246, 7 U.S.C.A. § 601 et seq., witnessed the most marked departure from the theory of the Sherman Act.

The Agricultural Adjustment Act of 1933, in some of its material features, was held invalid in the case of United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L. Ed. 477, 102 A.L.R. 914. The decision in this case affected only the production control and the processing tax provisions of the act of 1933. The act of 1933, as amended in 1935, contained provisions relative to the marketing of agricultural products. The decision in the Butler case, supra, cast some doubt on the validity of the marketing provisions of the several acts. To cure the infirmities, if any, in the marketing provisions of the Agricultural Adjustment Act, the Congress enacted into separate legislation the marketing and order provisions of the Agricultural Adjustment Act. The Congress, therefore, by the act of June 3, 1937, enacted the Agricultural Marketing Agreement Act Ch. 296, 50 Stat. 246. It reenacted, affirmed and validated, without material change, the provisions of the Agricultural Adjustment Act, as amended, relating to marketing agreements and orders. The Agricultural Marketing Agreement Act has been held valid in the cases of United States v. Rock Royal Co-operative, Inc., 59 S.Ct. 993, 83 L.Ed. ——, and H. P. Hood & Sons, Inc., v. United States et al., 59 S.Ct. 1019, 83 L.Ed. ——, by opinions of the Supreme Court handed down June 5, 1939.

The original Agricultural Adjustment Act, 48 Stat. 31, was passed by Congress to relieve the then economic depression in the basic industry of agriculture. The act was preceded by a declaration of emergency in which it was recited that the normal currents of commerce in agricultural commodities have been burdened and obstructed by the severe disparity between the prices of agricultural commodities and the prices of industrial products, which disparity has resulted in the substantial destruction of the purchasing power of farmers for industrial products and the breaking down of the orderly exchange of all commodities. It therefore declared that "these conditions in the basic industry of agriculture have affected transactions in agricultural commodities with a national public interest."

The Agricultural Marketing Agreement Act, 7 U.S.C.A. § 601, makes substantially the same declaration, namely, that transactions in agricultural commodities affect "a national public interest." The Congress then proceeds, by the purview of the act which follows the declaration of emergency, to remedy this deplorable condition. The act provides in detail how the "national public interest" in transactions affecting agricultural commodities shall be conserved, protected and advanced.

Following the declaration of emergency and a statement of the conditions confronting agriculture and industry, the policy which was intended to be effected, the end to be accomplished, is stated clearly and succinctly: "To establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period." 7 U.S.C.A. § 602 (1).

Another declared policy was that of protecting the interest of the consumer by "approaching the level of prices which it is declared to be the policy of Congress to establish in subsection (1) of this section by gradual correction of the current level at as rapid a rate as the Secretary of Agriculture deems to be in the public interest and feasible in view of the current consumptive demand in domestic and foreign markets * * *." 7 U.S.C.A. § 602(2).

The declared policy of Congress, therefore, was directed towards the protection and stabilization of transactions in agricultural commodities. In construing and applying the Agricultural Adjustment Act, as amended, and the Agricultural Marketing Agreement Act, the policy of Congress, as stated both in the declaration of emergency and in the declaration of policy, must constantly be borne in mind.

This express policy of the Congress was intended to be put into practical execution. Its practical execution was to be had "through the exercise of the powers conferred upon the Secretary of Agriculture under this chapter." 7 U.S.C.A. § 602(1).

The base period for agricultural commodities, with exceptions not here material, "shall be the prewar period, August 1909–July 1914." 7 U.S.C.A. § 602(1).

In order to execute the declared policy of the act, the Secretary of Agriculture is vested with power to enter into marketing agreements. The statute reads: "In order to effectuate the declared policy of this title [chapter], the Secretary of Agriculture shall have the power, after due notice and opportunity for hearing, to enter into marketing agreements with processors, producers, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof, only with respect to such handling as is in the current of interstate or foreign commerce or which directly burdens, obstructs, or affects, interstate or foreign commerce in such commodity or product thereof. The making of any such agreement shall not be held to be in violation of any of the antitrust laws of the United States, and any such agreement shall be deemed to be lawful * * *." 7 U.S.C.A. § 608b.

Not only is the Secretary of Agriculture vested with power to enter into marketing agreements with producers and handlers, but also he is charged with the mandatory duty, under given circumstances, to enter orders. 7 U.S.C.A. § 608-c(1).

The statute reads, "The Secretary of Agriculture shall, subject to the provisions of this section, issue, and from time to time amend, orders applicable to processors, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof specified in subsection (2) of this section." 7 U.S.C.A. § 608c(1).

Among other commodities to which orders "shall be applicable", is milk. 7 U.S.C.A. § 608c(2).

It will be noted that the Secretary of Agriculture is empowered to enter into marketing agreements, but that he is required to enter orders. 7 U.S.C.A. § 608b and 608c(1).

The object of the order is that of regulation of the handling of agricultural commodities which are in interstate commerce. Again, a mandatory duty is imposed on the Secretary of Agriculture. The statute says that the "orders shall regulate", the limitation being that the orders shall apply only to interstate or foreign commerce. The statute reads: "Such orders shall regulate, in the manner hereinafter in this section provided, only such handling of such agricultural commodity, or product thereof, as is in the current of interstate or foreign commerce, or which directly burdens, obstructs, or affects, interstate or foreign commerce in such commodity or product thereof." 7 U.S.C.A. § 608c(1).

Before an order can be issued, preliminary steps must be taken. There must be notice and an opportunity for a hearing. 7 U.S.C.A. § 608c(3). There must be a finding by the Secretary of Agriculture, based upon evidence introduced at such hearing, "that the issuance of such order and all of the terms and conditions thereof will tend to effectuate the declared policy of this

chapter with respect to such commodity. * * *" 7 U.S.C.A. § 608c(4).

Where an order is issued with a marketing agreement, it does not become effective until the handlers of not less than fifty per cent of the volume of the commodity within the area of the order have signed the marketing agreement, and does not become effective until approved by at least two-thirds of the producers by number, or by producers who have produced for market at least two-thirds of the volume of such commodity. 7 U.S.C.A. § 608-c(8). The approval by a cooperative agency is considered the approval of its members. 7 U.S.C.A. § 608c(12). However, an order may become effective notwithstanding its disapproval by the handlers if the Secretary of Agriculture, with the approval of the President, determines (1) that the failure of the handlers to sign the marketing agreement "tends to prevent the effectuation of the declared policy of this chapter [title] with respect to such commodity or product"; (2) that the issuing of such order is the only practical means of advancing the interests of the producers of such commodity and is approved or favored (a) by two-thirds of the producers, or (b) by producers who have produced two-thirds of the volume of the commodity. 7 U.S.C.A. § 608c(9) (A) (B).

If a handler feels that an order is not in accordance with law, he is entitled, on petition, to a hearing by the Secretary of Agriculture, after which the Secretary of Agriculture must make a ruling "which shall be final, if in accordance with law." 7 U.S.C.A. § 608c(15) (A).

This order is subject to judicial review. 7 U.S.C.A. § 608c(15) (B).

Orders are required to contain one or more of the following terms and conditions: (1) prohibiting unfair methods of competition and unfair trade practices, (2) providing for the selection of an agency which shall have the power (a) to administer the order; (b) to make rules and regulations to carry out the order, (c) to investigate complaints or violations, and (d) to recommend amendments. 7 U.S.C.A. § 608c(7).

In the case of milk and its products, special terms and conditions must be contained in the order. These terms and conditions are set forth quite at length. A recital of such terms and conditions is not pertinent to the inquiry before this court,

and hence the court contents itself with a mere reference to the statute. 7 U.S.C.A. § 608c(5).

Jurisdiction is given to the District Court "to enforce, and to prevent and restrain any person from violating any order, regulation, or agreement, heretofore or hereafter made or issued pursuant to this chapter." 7 U.S.C.A. § 608a(6).

Provision is also made for a criminal prosecution against a handler who violates the provision of any order. 7 U.S.C.A. § 608c(14).

Provision is further made whereby the Secretary of Agriculture may terminate or suspend the operation of an order. The wording of the statute is, "The Secretary of Agriculture shall, whenever he finds that any order issued under this section, or any provision thereof, obstructs or does not tend to effectuate the declared policy of this title, terminate or suspend the operation of such order or such provision thereof." 7 U.S.C.A. § 608c(16) (A).

Section 611, 7 U.S.C.A. § 611, declares the conditions upon which any product shall be excluded from the operations of the law. In order to remove the marketing of any such agricultural products from the operations of the law, the Secretary must first institute an investigation. He must give notice and an opportunity for interested parties to be heard. If, after such investigation, notice and hearing, he concludes that the conditions of production, marketing and consumption are such that, during any period, the law cannot be effectively administered to the end of effectuating the declared policy with respect to such commodity, then "the Secretary of Agriculture shall exclude from the operation of the provisions of this chapter, during any period, any such commodity * * *."

This section contains the only provision whereby the marketing of any basic agricultural commodity, including milk, may be exempted from the jurisdiction and control of the Secretary of Agriculture. Until the Secretary invokes the power of investigation, notice and hearing, conferred upon him by this section, the basic agricultural commodity, so far as the marketing thereof is concerned, remains where the statute put it, namely, in the Secretary of Agriculture.

The Agricultural Marketing Agreement Act was designed to improve the marketing of agricultural products, including milk,

under the supervision and regulation of the Department of Agriculture. The act is wider in content than the Capper-Volstead Act. It extends to both distributors and producers. It placed both producers and distributors of agricultural products, including milk, under the exclusive control of the Secretary of Agriculture.

Vast powers were conferred upon the Secretary of Agriculture with relation to the production, distribution and marketing of agricultural products, including milk. The theory of the act is to improve the condition of agriculture throughout the United States under the supervision, direction and regulation of the Secretary of Agriculture. To attain this end powers commensurate with his duty and responsibility are vested in the Secretary. Under the Agricultural Marketing Agreement Act of June 3, 1937 the Secretary of Agriculture is vested with full and plenary power to enter into marketing agreements with both the producers, handlers and distributors of agricultural products.

A study of statutory policy from the Sherman Act of 1890 to the Agricultural Marketing Agreement Act of 1937 shows a constant and growing tendency on the part of Congress to control and regulate the production and marketing of agricultural products, including milk, through the administrative agency of the Secretary of Agriculture. The whole theory and policy of the Agricultural Marketing Agreement Act is that of governmental control, regulation and supervision. The production and marketing of agricultural products, including milk, has, so far as interstate commerce is concerned, been removed from the sphere of trade and barter in a free agency to a status of dependence and obedience to the supreme, exclusive and plenary control of the Secretary of Agriculture, subject to judicial review in the mode provided by the statute.

The Court holds that, by the Agricultural Marketing Agreement Act the Congress has committed to the Executive Department, acting through the Secretary of Agriculture, full, complete and plenary power over the production and marketing, in interstate commerce, of agricultural products, including milk.

 To what extent he should act, the quantum of regulation, is solely one for his judgment and decision. If conditions require, he must act; if they do not require action, then all marketing conditions are deemed satisfactory and the purpose of the act is effectuated. Non-action by the Secretary of Agriculture, in any given marketing area, is equivalent to a declaration that the policy of the act, in that area, is being carried out. If the policy of the act, in any given milk area, is being violated it becomes the duty of the Secretary of Agriculture to intervene and invoke the powers conferred upon him by the act.

 It results, from what has been said, that the power of regulation, supervision and control of the milk industry, in any given milk shed, is, by the Agricultural Marketing Agreement Act of 1937, vested exclusively in the Secretary of Agriculture. It follows further that the Secretary of Agriculture cannot by his own action, or inaction, divest himself of this power so long as the statute remains in force. The marketing of the agricultural products, including milk, covered by the Agricultural Marketing Agreement Act, is removed from the purview of the Sherman Act. In other words, so far as the marketing of agricultural commodities, including milk, is concerned, no indictment will lie under section 1 of the Sherman Act.

 The question of whether or not the indictment charges that the combination and conspiracy restrained trade and commerce in fluid milk among the several states has been extensively and ably argued on both sides, the government contending that the averments of the indictment plainly charge a combination and conspiracy in restraint of interstate commerce and the defendants contending that the indictment, properly analyzed and considered, fails to charge a combination and conspiracy in restraint of interstate commerce. It will be perceived, however, from what has been stated, that as to Counts 1, 2 and 4 of the indictment it is unnecessary to decide whether or not the allegations of the indictment show that interstate commerce was or was not restrained. If the marketing of milk in the Chicago milk shed burdens, obstructs or affects interstate commerce in fluid milk, then, as above concluded, the merchandising thereof was subject to the plenary and exclusive control of the Secretary of Agriculture through marketing agreements or orders made pursuant to the Agricultural Marketing Agreement Act. If, on the other hand, the acts charged in the indictment do not burden, obstruct or affect interstate commerce in fluid milk, then plainly no offense under the Sherman Act has been charged under Counts 1, 2 and 4.

188

The demurrers to Counts 1, 2 and 4 must, therefore, be sustained.

The averments of Count 3 have hereinbefore been set forth.

This count charges at least four separate, different and independent conspiracies or combinations. This is not a case of one conspiracy accomplished by several acts; it is several independent conspiracies. Each of the conspiracies affects different individuals or affects the same individuals in entirely different situations.

It is one thing to hinder and prevent prospective independent distributors from engaging in the business of distributing fluid milk. It is entirely different to hinder and prevent existing independent distributors from distributing fluid milk in Chicago in competition with the major distributors. To hinder and prevent distribution of fluid milk to stores and by stores in the city of Chicago is different from any conspiracy previously charged in this count. To hinder and prevent any distribution of fluid milk in the city of Chicago, except by the method and in the manner determined by said defendants, is also conspiracy sharply differentiated from the three conspiracies previously charged in this indictment.

This count is challenged as bad for duplicity. The Court believes the challenge to be well taken and holds that the count charges at least four distinct and separate conspiracies, and not a single conspiracy.

Moreover, this count deals with "independent distributors" and stores. It is also challenged on the ground that the supposed restraints therein described do not affect any interstate commerce. The indictment alleges generally the origin of fluid milk transported into Chicago from Illinois, Indiana, Michigan and Wisconsin. It further alleges that all the major distributors have country stations outside of Illinois and transport, or cause to be transported, milk received in such stations to Chicago. The indictment is lacking as to averments or allegations as to the origin of fluid milk sold by stores or independent distributors. It is only by intendment and inference that the Court could conclude from an examination of the indictment that the conspiracy charged in Count 3 had any effect on interstate commerce. It is only by such intendment and inference that the Court could conclude that the stores and independent distributors, whose system of distribution the defendants are alleged to have controlled, sold fluid milk which was or had been the subject of interstate commerce. It is a fundamental of criminal pleading that an indictment must allege directly and with certainty every essential element or ingredient of the offense. If any essential element or ingredient of the crime is omitted, such omission cannot be supplied by intendment or implication. Pettibone v. U. S., 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419; United States v. Carney, D.C., 228 F. 163.

The demurrer to Count 3, therefore, must be sustained.