UNITED STATES *v.* BORDEN COMPANY ET AL.

No. 397.   Argued November 15, 1939.—Decided December 4, 1939.

*Assistant Attorney General Arnold,* with whom *Solicitor General Jackson* and *Messrs. Hugh B. Cox, Leo F. Tierney, Robert K. McConnaughey, Maurice L. A. Gellis,* and *William J. Campbell* were on the brief, for the United States.

*Mr. Loy N. McIntosh,* with whom *Messrs. Bernhardt Frank* and *Frederick Secord* were on the brief, for Sidney Wanzer & Sons, Inc. et al.; *Mr. William C. Graves,* with whom *Messrs. Edward J. Hennessy* and *Martin Burns* were on the brief, for Pure Milk Assn. et al.; *Mr. Joseph A. Padway,* with whom *Mr. Abraham W. Brussell* was on the brief, for Robert G. Fitchie et al.; *Mr. Frederic Burnham,* with whom *Messrs. Miles G. Seeley, Louis E. Hart, Irving Herriott,* and *Isidore Fried* were on the brief, for The Borden Co. et al.; *Mr. Daniel D. Carmell* submitted for Leslie G. Goudie; *Messrs. Charles S. Deneen, Roy Massena,* and *Donald N. Schaffer* submitted for Hunding Dairy Co. et al.; *Messrs. Ben H. Matthews* and *James P. Dillie* submitted for Leland Spencer; *Mr. Louis M. Mantynband* submitted for Western United Dairy Co. et al.; and *Messrs. Ben H. Matthews, Harry J. Dunbaugh,* and *James P. Dillie* were on a brief for Associated Milk Dealers, Inc. et al.,—appellees.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The Government appeals from a judgment of the District Court sustaining demurrers and dismissing an indictment charging combination and conspiracy in violation of § 1 of the Sherman Anti-Trust Act. 28 F. Supp. 177.

The trade and commerce alleged to be involved is the transportation to the Chicago market of fluid milk produced on dairy farms in Illinois, Indiana, Michigan and Wisconsin and the distribution of the milk in that market. The Government divides the defendants into five groups,—(1) distributors and allied groups which include a number of corporations described as major distributors and their officers and agents, the Associated Milk Dealers, Inc., a trade association of milk distributors, and its officers and agents, and the Milk Dealers Bottle Exchange, a corporation controlled by the major distributors; (2) the Pure Milk Association, a coöperative association of milk producers incorporated in Illinois, and its officers and agents; (3) the Milk Wagon Drivers Union, Local 753, engaged in the distribution of milk in Chicago, and certain labor officials; (4) municipal officials, including the president of the Board of Health of Chicago and certain subordinate officials; (5) two persons who arbitrated a dispute between the major distributors and the Pure Milk Association, fixing the price of milk to be paid to the members of the association.

The indictment, which was filed in November, 1938, contains four counts. The several defendants challenged it by demurrers and motions to quash on various grounds. The District Court held with respect to counts one, two and four, that the production and marketing of agricultural products, including milk, are removed from the purview of the Sherman Act by the Agricultural Marketing Agreement Act of 1937 (50 Stat. 246); also with respect to all four counts, according to the formal terms of its judgment, that the Pure Milk Association, as an agricultural coöperative association, its officers and agents, are exempt from prosecution under § 1 of the Sherman Act by § 6 of the Clayton Act (15 U. S. C. 17), §§ 1 and 2 of the Capper-Volstead Act (7 U. S. C. 291,

292), and the Agricultural Marketing Agreement Act. With respect to count three, the District Court held that it was duplicitous, in the view that it charged several separate conspiracies and also that it did not definitely charge a restraint of interstate commerce.

The judgment expressly overruled the demurrers and motions to quash so far as they challenged the constitutionality of the Sherman Act or the sufficiency of the allegations of unlawful conspiracy, and also so far as it was contended that interstate commerce was not involved in counts one, two and four. The court added that it overruled all the defendants' contentions which it had not specifically overruled or sustained. The judgment ends by dismissing the indictment as to all defendants.

The first question presented concerns our jurisdiction. The exceptional right of appeal given to the Government by the Criminal Appeals Act is strictly limited to the instances specified.[1] The provision invoked here is the

---

[1] This Act (18 U. S. C. 682, Jud. Code, § 238, 28 U. S. C. 345) provides:

"An appeal may be taken by and on behalf of the United States from the district courts direct to the Supreme Court of the United States in all criminal cases, in the following instances, to wit:

"From a decision or judgment quashing, setting aside, or sustaining a demurrer to, any indictment, or any count thereof, where such decision or judgment is based upon the invalidity, or construction of the statute upon which the indictment is founded.

"From a decision arresting a judgment of conviction for insufficiency of the indictment, where such decision is based upon the invalidity or construction of the statute upon which the indictment is founded.

"From the decision or judgment sustaining a special plea in bar, when the defendant has not been put in jeopardy. . . .

"Pending the prosecution and determination of the appeal in the foregoing instances, the defendant shall be admitted to bail on his own recognizance: *Provided,* That no appeal shall be taken by or allowed the United States in any case where there has been a verdict in favor of the defendant."

one which permits review where a decision quashing or sustaining a demurrer to an indictment or any of its counts is based upon the "construction of the statute upon which the indictment is founded." The decision below was not predicated upon invalidity of the statute.

The established principles governing our review are these: (1) Appeal does not lie from a judgment which rests on the mere deficiencies of the indictment as a pleading, as distinguished from a construction of the statute which underlies the indictment. (2) Nor will an appeal lie in a case where the District Court has considered the construction of the statute but has also rested its decision upon the independent ground of a defect in pleading which is not subject to our examination. In that case we cannot disturb the judgment and the question of construction becomes abstract. (3) This Court must accept the construction given to the indictment by the District Court as that is a matter we are not authorized to review. (4) When the District Court holds that the indictment, not merely because of some deficiency in pleading but with respect to the substance of the charge, does not allege a violation of the statute upon which the indictment is founded, that is necessarily a construction of that statute. (5) When the District Court has rested its decision upon the construction of the underlying statute this Court is not at liberty to go beyond the question of the correctness of that construction and consider other objections to the indictment. The Government's appeal does not open the whole case.

*First.* The first two of these principles, as the Government concedes, preclude our review of the decision below as to count three. For that count was held bad upon the independent ground that it is defective as a pleading, being duplicitous and also lacking in definiteness. *United States* v. *Keitel,* 211 U. S. 370, 397–399; *United States* v.

*Carter*, 231 U. S. 492, 493; *United States* v. *Hastings*, 296 U. S. 188, 192–194. The appeal as to count three must be dismissed.

*Second.* After a general description of the averments of the indictment, which was explicitly founded on § 1 of the Sherman Act, the District Court construed counts one, two and four as follows:

"Count 1 charges a conspiracy 'to arbitrarily fix, maintain and control artificial and non-competitive prices to be paid to all producers by all distributors for all fluid milk produced on approved dairy farms located in the states of Illinois, Indiana, |Michigan and Wisconsin', and shipped to Chicago."

"Count 2 charges a conspiracy 'to fix and maintain by common and concerted action, uniform, arbitrary and non-competitive prices for the sale by the distributors in the city of Chicago of fluid milk shipped into the said city from the states of Illinois, Indiana, Michigan and Wisconsin.' "

"Count 4 charges a conspiracy 'to restrict, limit and control and to restrain and obstruct the supply of fluid milk moving in the channels of interstate commerce into the city of Chicago from the states of Illinois, Indiana, Michigan and Wisconsin.' "

The District Court further summarized the allegations in these counts as to the methods by which the alleged conspiracies were intended to be effected. 28 F. Supp. pp. 179–181. This construction of the indictment is binding upon this Court on this appeal. *United States* v. *Patten*, 226 U. S. 525, 535, 540; *United States* v. *Colgate & Co.*, 250 U. S. 300, 301; *United States* v. *Schrader's Son*, 252 U. S. 85, 98; *United States* v. *Yuginovich*, 256 U. S. 450, 461; *United States* v. *Hastings, supra*, p. 192.

*Third.* The District Court, thus construing counts one, two and four, held as a matter of substance that, because

of the effect of the later statutes, these counts did not charge an offense under § 1 of the Sherman Act. This was necessarily a construction of the Sherman Act. *United States* v. *Patten, supra; United States* v. *Birdsall,* 233 U. S. 223, 230; *United States* v. *Kapp,* 302 U. S. 214, 217. We are not impressed with the argument that the court simply construed the later statutes. The effect of those statutes was considered in determining whether the Sherman Act has been so modified and limited that it no longer applies to such combinations and conspiracies as are charged in counts one, two and four. Thus the Sherman Act was not the less construed because it was construed in the light of the subsequent legislation.

We have jurisdiction under the Criminal Appeals Act to determine whether the construction thus placed upon the Sherman Act is correct.

*Fourth.* In reaching its conclusion, the District Court referred to § 6 of the Clayton Act, §§ 1 and 2 of the Capper-Volstead Act, and the Agricultural Adjustment Act of 1933, as amended in 1935, and as reënacted and amended by the Agricultural Marketing Agreement Act of 1937.

With respect to the Clayton Act,[2] the court said in its opinion: "By that act labor, agricultural or horticultural cooperative organizations were excepted from the

---

[2] Section 6 of the Clayton Act (38 Stat. 730, 15 U. S. C. 17) provides:

"The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

broad and sweeping terms of the Sherman Act. Such cooperative organizations, in and of themselves, were not to be construed as illegal combinations or conspiracies in restraint of trade under the anti-trust laws." 28 F. Supp. 183. But the court did not hold that, by these provisions of the Clayton Act, either the defendants Pure Milk Association and its officers and agents or the defendants Milk Wagon Drivers Union, Local 753, and its officials, (albeit these organizations were not in themselves illegal combinations or conspiracies) were rendered immune from prosecution under the Sherman Act for their alleged participation in the combinations and conspiracies charged in counts one, two and four of the indictment. The Sherman Act was not construed by the District Court as having been limited to that extent by the Clayton Act.

The court invoked the Capper-Volstead Act,[3] as its judgment shows, only in relation to certain defendants, that is, the Pure Milk Association, an agricultural cooperative oganization, and its officers and agents. We shall consider later the effect of that statute upon the charge against those defendants.

The court dismissed the indictment as to *all* defendants, and we think it manifest that this ruling in its bearing upon counts one, two and four was due to the effect upon the Sherman Act which the court attributed to the Agricultural Marketing Agreement Act.[4]

(1). As to that Act, the court said:

"The Court holds that, by the Agricultural Marketing Agreement Act the Congress has committed to the Execu-

---

[3] 42 Stat. 388, 7 U. S. C. 291, 292.

[4] The District Court referred, in passing, to the Cooperative Marketing Act of July 2, 1926 (44 Stat. 803, 7 U. S. C. 455), and to the provisions of the Agricultural Adjustment Act of 1933 (48 Stat. 31), as amended in 1935 (49 Stat. 750), which was followed by the Agricultural Marketing Agreement Act of 1937 (50 Stat. 246).

tive Department, acting through the Secretary of Agriculture, full, complete and plenary power over the production and marketing, in interstate commerce, of agricultural products, including milk.

"To what extent he should act, the quantum of regulation, is solely one for his judgment and decision. If conditions require, he must act; if they do not require action, then all marketing conditions are deemed satisfactory and the purpose of the act is effectuated. Non-action by the Secretary of Agriculture, in any given marketing area, is equivalent to a declaration that the policy of the act, in that area, is being carried out. If the policy of the act, in any given milk area, is being violated it becomes the duty of the Secretary of Agriculture to intervene and invoke the powers conferred upon him by the act.

"It results, from what has been said, that the power of regulation, supervision and control of the milk industry, in any given milk shed, is, by the Agricultural Marketing Agreement Act of 1937, vested exclusively in the Secretary of Agriculture. It follows further that the Secretary of Agriculture cannot by his own action, or inaction, divest himself of this power so long as the statute remains in force. The marketing of the agricultural products, including milk, covered by the Agricultural Marketing Agreement Act, is removed from the purview of the Sherman Act. In other words, so far as the marketing of agricultural commodities, including milk, is concerned, no indictment will lie under section 1 of the Sherman Act." 28 F. Supp. p. 187.

It will be observed that the District Court attributes this effect to the Agricultural Marketing Agreement Act *per se,* that is, to its operation in the absence, and without regard to the scope and particular effect, of any marketing agreements made by the Secretary of Agriculture or of any orders issued by him pursuant to the Act. In the opinion of the court below, the existence of the au-

thority vested in the Secretary of Agriculture, although unexercised, wholly destroys the operation of § 1 of the Sherman Act with respect to the marketing of agricultural commodities.

·We are of the opinion that this conclusion is erroneous. No provision of that purport appears in the Agricultural Act. While effect is expressly given, as we shall see, to agreements and orders which may validly be made by the Secretary of Agriculture, there is no suggestion that in their absence, and apart from such qualified authorization and such requirements as they contain, the commerce in agricultural commodities is stripped of the safeguards set up by the Anti-Trust Act and is left open to the restraints, however unreasonable, which conspiring producers, distributors and their allies may see fit to impose. We are unable to find that such a grant of immunity by virtue of the inaction, or limited action, of the Secretary has any place in the statutory plan. We cannot believe that Congress intended to create "so great a breach in historic remedies and sanctions." [5]

It is a cardinal principle of construction that repeals by implication are not favored. When there are two acts upon the same subject, the rule is to give effect to both if possible. *United States* v. *Tynen,* 11 Wall. 88, 92; *Henderson's Tobacco,* 11 Wall. 652, 657; *General Motors Acceptance Corp.* v. *United States,* 286 U. S. 49, 61, 62. The intention of the legislature to repeal "must be clear and manifest." *Red Rock* v. *Henry,* 106 U. S. 596, 601, 602. It is not sufficient, as was said by Mr. Justice Story in *Wood* v. *United States,* 16 Pet. 342, 362, 363, "to establish that subsequent laws cover some or even all of the cases provided for by [the prior act]; for they may be merely affirmative, or cumulative, or auxiliary." There

---

[5] See *General Motors Acceptance Corp* v. *United States,* 286 U. S.

must be "a positive repugnancy between the provisions of the new law, and those of the old; and even then the old law is repealed by implication only *pro tanto* to the extent of the repugnancy." See, also, *Posados* v. *National City Bank,* 296 U. S. 497, 504.

The Sherman Act is a broad enactment prohibiting unreasonable restraints upon interstate commerce, and monopolization or attempts to monopolize, with penal sanctions. The Agricultural Act is a limited statute with specific reference to particular transactions which may be regulated by official action in a prescribed manner. The Agricultural Act [6] declares it to be the policy of Congress "through the exercise of the powers conferred upon the Secretary of Agriculture under this chapter, to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period" described. To carry out that policy a particular plan is set forth. Farmers and others are not permitted to resort to their own devices and to make any agreements or arrangements they desire, regardless of the restraints which may be inflicted upon commerce. The statutory program to be followed under the Agricultural Act requires the participation of the Secretary of Agriculture who is to hold hearings and make findings. The obvious intention is to provide for what may be found to be reasonable arrangements in particular instances and in the light of the circumstances disclosed. The methods which the Agricultural Act permits to attain that result are twofold, marketing agreements and orders. To give validity to marketing agreements the Secretary must be an

[6] 7 U. S. C. Supp. IV, 602 (1).

actual party to the agreements. § 8b.[7] The orders are also to be made by the Secretary for the purpose of regulating the handling of the agricultural commodity to which the particular order relates. § 8c (3) (4).[8] That the field covered by the Agricultural Act is not coterminous with that covered by the Sherman Act is manifest from the fact that the former is thus delimited by the prescribed action participated in and directed by an officer of government proceeding under the authority specifically conferred by Congress. As to agreements and arrangements not thus agreed upon or directed by the Secretary, the Agricultural Act in no way impinges upon the prohibitions and penalties of the Sherman Act, and its condemnation of private action in entering into combinations and conspiracies which impose the prohibited restraint upon interstate commerce remains untouched.

It is not necessary to labor the point, for the Agricultural Act itself expressly defines the extent to which its provisions make the antitrust laws inapplicable. That definition is found in § 8 (b)[9] of the Agricultural Adjustment Act carried into the Agricultural Marketing Agreement Act in relation to marketing agreements, and provides as follows:

"In order to effectuate the declared policy of this chapter, the Secretary of Agriculture shall have the power, after due notice and opportunity for hearing, to enter into marketing agreements with processors, producers, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof, only with respect to such handling as is in the current of interstate or foreign commerce or which directly burdens, obstructs, or affects, interstate or foreign commerce in

[7] 7 U. S. C. Supp. IV, § 608b.
[8] 7 U. S. C. Supp. IV, § 608c (3) (4).
[9] 7 U. S. C. Supp. IV, § 608b.

such commodity or product thereof. The making of any such agreement shall not be held to be in violation of any of the antitrust laws of the United States, and any such agreement shall be deemed to be lawful: *Provided,* That no such agreement shall remain in force after the termination of this chapter."

Another provision is found in § 3 (d)[10] of the Agricultural Marketing Agreement Act, relating to awards or agreements resulting from the arbitration or mediation by the Secretary of Agriculture or by a designated officer or employee of the Department of Agriculture as provided in § 3 (a),[11] and meetings for that purpose and awards or agreements resulting therefrom which have been approved by the Secretary of Agriculture as provided in § 3 (b).[12] Section 3 (d) provides:

"No meeting so held and no award or agreement so approved shall be deemed to be in violation of any of the antitrust laws of the United States."

These explicit provisions requiring official participation and authorizations show beyond question how far Congress intended that the Agricultural Act should operate to render the Sherman Act inapplicable.[13] If Congress had desired to grant any further immunity, Congress doubtless would have said so.

An agreement made with the Secretary as a party, or an order made by him, or an arbitration award or agreement approved by him, pursuant to the authority conferred by the Agricultural Act and within the terms of the described immunity, would of course be a defense to a prosecution under the Sherman Act to the extent that the prosecution sought to penalize what was thus validly

[10] 50 Stat. 249.
[11] 50 Stat. 248.
[12] 50 Stat. 248.
[13] See 77 Cong. Rec., Pt. II, p. 1977; Pt. III, p. 3117.

agreed upon or directed by the Secretary. Further than that the Agricultural Act does not go.

We have no occasion to decide whether in any particular case an indictment under the Sherman Act by reason of its particular terms would be subject to demurrer, or to a motion to quash, upon the ground that the indictment ran against the provisions of such an agreement or order. We have no such situation here. There is indeed a contention that there was a license (No. 30) issued by the Secretary of Agriculture in 1934, amended in January 1935, and in force until March 2, 1935, which related to the marketing of milk in the Chicago area, and hence that defendants operating under that license were not subject to the charges of the conspiracies alleged to have begun in January, 1935. But the allegations of the indictment are that the unlawful conspiracies continued throughout all the period mentioned in the indictment, that is, up to the time of its presentment in November, 1938. This clearly imports that the conspiracies were operative after the license came to an end and thus in the absence of any license. A conspiracy thus continued is in effect renewed during each day of its continuance. *United States* v. *Kissel,* 218 U. S. 601, 607, 608; *Hyde* v. *United States,* 225 U. S. 347, 369; *Brown* v. *Elliott,* 225 U. S. 392, 400. It is also said that there is a recent marketing order under date of August 29, 1939,[14] which relates to the Chicago marketing area, and hence that this cause is moot. But that order affects a period subsequent to the time covered by the indictment. These contentions are unavailing in relation to the question before us.

Our conclusion is that the Agricultural Adjustment Act as reënacted and amended by the Agricultural Marketing Agreement Act affords no ground for construing

---

[14] Federal Register, August 30, 1939, Order No. 41, Vol. 4, pp. 3764–3768; 3770.

the Sherman Act as inapplicable to the charges contained in counts one, two and four.

(2) There remains the question whether the court below rightly held that the Capper-Volstead Act [15] had modified the Sherman Act so as to exempt the Pure Milk Association, a coöperative agricultural organization, and its officers and agents, from prosecution under these counts.

As to the Capper-Volstead Act the court said:

"This Act legalizes price fixing for those within its purview. To that extent it modifies the Sherman Act. It removes from the Sherman Act those organizations, coöperative in their nature, which come within the purview of the Capper-Volstead Act. Prior to the Capper-Volstead Act farmers were treated no differently than others under the antitrust laws, so far as price fixing was concerned. . . .

"The Capper-Volstead Act does not condemn any kind of monopoly or restraint of trade, or any price fixing, unless such monopoly or price fixing unduly enhances the price of an agricultural product. The Act then, by section 2 thereof, commits to an officer of the executive department, the Secretary of Agriculture, the power of regulation and visitation.

"Under this act farmers are favored under the antitrust laws in that they are given a qualified right, free from any criminal liability, to combine among themselves to monopolize and restrain interstate trade and commerce in farm products and to fix and enhance the price thereof.

" . . . The court deduces from the Capper-Volstead Act that the Secretary of Agriculture has exclusive jurisdiction to determine and order, in the first instance, whether or not farmer cooperatives, in their operation, monopolize and restrain interstate trade and commerce

---

[15] 42 Stat. 388, 7 U. S. C. 291, 292.

'to such an extent that the price of any agricultural product is unduly enhanced'. Until the Secretary of Agriculture acts, the judicial power cannot be invoked." 28 F. Supp., pp. 183, 184.

We are unable to accept that view. We cannot find in the Capper-Volstead Act, any more than in the Agricultural Act, an intention to declare immunity for the combinations and conspiracies charged in the present indictment. Section 6 of the Clayton Act, enacted in 1914,[16] had authorized the formation and operation of agricultural organizations provided they did not have capital stock or were conducted for profit, and it was there provided that the antitrust laws should not be construed to forbid members of such organizations "from lawfully carrying out the legitimate objects thereof." They were not to be held illegal combinations. The Capper-Volstead Act, enacted in 1922,[17] was made applicable as well to coöperatives having capital stock. The persons to whom the Capper-Volstead Act applies are defined in § 1 as producers of agricultural products, "as farmers, planters, ranchmen, dairymen, nut or fruit growers." They are authorized to act together "in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce" their products. They may have "marketing agencies in common," and they may make "the necessary contracts and agreements to effect such purposes."

The right of these agricultural producers thus to unite in preparing for market and in marketing their products, and to make the contracts which are necessary for that collaboration, cannot be deemed to authorize any combination or conspiracy with other persons in restraint of

[16] 38 Stat. 731.
[17] 42 Stat. 388.

trade that these producers may see fit to devise. In this instance, the conspiracy charged is not that of merely forming a collective association of producers to market their products but a conspiracy, or conspiracies, with major distributors and their allied groups, with labor officials, municipal officials, and others, in order to maintain artificial and non-competitive prices to be paid to all producers for all fluid milk produced in Illinois and neighboring States and marketed in the Chicago area, and thus in effect, as the indictment is construed by the court below, "to compel independent distributors to exact a like price from their customers" and also to control "the supply of fluid milk permitted to be brought to Chicago." 28 F. Supp. 180–182. Such a combined attempt of all the defendants, producers, distributors and their allies, to control the market finds no justification in § 1 of the Capper-Volstead Act.

Nor does the court below derive its limitation of the Sherman Act from § 1. The pith of the court's conclusion is that under § 2 an exclusive jurisdiction with respect to the described coöperative associations is vested, in the first instance, in the Secretary of Agriculture, and that, until the Secretary acts, the judicial power to entertain a prosecution under the Sherman Act cannot be invoked. Section 2 of the Capper-Volstead Act does provide a special procedure in a case where the Secretary of Agriculture has reason to believe that any such association "monopolizes" or restrains interstate trade "to such an extent that the price of any agricultural product is unduly enhanced." Thereupon the Secretary is to serve upon the association a complaint, stating his charge with notice of hearing. And if upon such hearing the Secretary is of the opinion that the association "monopolizes," or does restrain interstate trade to the extent above mentioned, he then is to issue an order directing

the association "to cease and desist" therefrom. Provision is made for judicial review.

We find no ground for saying that this ·limited procedure is a substitute for the provisions of the Sherman Act, or has the result of permitting the sort of combina-·tions and conspiracies here charged unless or until the Secretary of Agriculture takes action. That this provision of the Capper-Volstead Act does not cover the entire field of the Sherman Act is sufficiently clear. The Sherm ᾽Act authorizes criminal prosecutions and penalties. The Capper-Volstead Act provides only for a civil proceeding. The Sherman Act hits at attempts to monopolize as well as actual monopolization. And § 2 of the Capper-Volstead Act contains no provision giving immunity from the Sherman Act in the absence of a proceeding by the Secretary. We think that the procedure under § 2 of the Capper-Volstead Act is auxiliary and was intended merely as a qualification of the authorization given to coöperative agricultural producers by § 1, so that if the collective action of such producers, as there permitted, results in the opinion of the Secretary in monopolization or unduly enhanced prices, he may intervene and seek to control the action thus taken under § 1. But as § 1 cannot be regarded as authorizing the sort of conspiracies between producers and others that are charged in this indictment, the qualifying procedure for which § 2 provides is not to be deemed to be designed to take the place of, or to postpone or prevent, prosecution under § 1 of the Sherman Act for the purpose of punishing such conspiracies.

· *Fifth.* Having dealt with the construction placed by the court below upon the Sherman Act, our jurisdiction on this appeal is exhausted. We are not at liberty to consider other objections to the indictment or questions which may arise upon the trial with respect to the merits

of the charge. For it is well settled that where the District Court has based its decision on a particular construction of the underlying statute, the review here under the Criminal Appeals Act is confined to the question of the propriety of that construction. *United States* v. *Keitel, supra; United States* v. *Kissel, supra,* p. 606; *United States* v. *Miller,* 223 U. S. 599, 602; *United States* v. *Carter, supra; United States* v. *Colgate & Co., supra; United States* v. *Schrader's Son, supra; United States* v. *Hastings, supra.* The case of *United States* v. *Curtiss-Wright Corporation,* 299 U. S. 304, is not opposed, as there the decision of the District Court was not based upon a particular construction of the underlying statute, but upon its invalidity, and the jurisdiction of this Court extended to the consideration of the rulings of the District Court which dealt with that question.

The limitation applicable in the instant case to the question of the District Court's construction of the Sherman Act disposes of the contention urged by some of the defendants that counts two and four do not show such a direct restraint upon interstate commerce as to bring the acts charged within the statute. The District Court said in its opinion that, in view of its rulings (above discussed) as to counts one, two and four, it was unnecessary to decide "whether or not the allegations of the indictment show that interstate commerce was or was not restrained." 28 F. Supp., p. 187. In its judgment the court formally overruled all objections to these counts so far as the objections rested on the ground that interstate commerce was not involved. If these rulings be treated as dealing merely with the construction of the indictment, they must be accepted here. *United States* v. *Patten, supra; United States* v. *Colgate & Co., supra; United States* v. *Hastings, supra.* But, apart from that, the District Court certainly has not construed the Sher-

man Act as inapplicable upon the ground that interstate commerce is not involved, and the question of the bearing upon that commerce of the acts charged is not before us.

Similarly, the contention of the defendants who are labor officials that the Sherman Act does not apply to labor unions or labor union activities is not open on this appeal. The District Court did not construe the Sherman Act as inapplicable to these defendants and the Government's appeal, under the restriction of the Criminal Appeals Act, does not present that question.

The appeal as to count three is dismissed. The judgment is reversed as to counts one, two and four, and the cause is remanded to the District Court for further proceedings in conformity with this opinion.

*It is so ordered.*